IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 3:11-CR-272-D (01) |
| | § | |
| BRANDON THOMPSON, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Brandon Thompson ("Thompson")—charged with the offense of possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)—moves to suppress a firearm seized from his apartment on April 13, 2011, and all other evidence obtained from the warrantless search of his apartment. Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

Prior to his arrest, Thompson resided in apartment 118 of a complex located at 3027 South Boulevard in Dallas, Texas (the "Complex"). The Complex was well known to Dallas Police Department ("DPD") officers due to its numerous problems with drug trafficking and gang activity. DPD was aware that numerous crimes had been committed on the premises of the Complex. The Complex was the subject of numerous complaints from tenants and

---

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

people from surrounding neighborhoods.

During the morning of April 13, 2011, DPD Officer Michael Scott Reuler ("Officer Reuler") spoke by telephone with Lazaro Gomez ("Gomez"), the Complex manager, in preparation for a police operation to be conducted there later that day. Gomez told Officer Reuler there were people at the Complex who Gomez thought did not belong there and were possibly dealing narcotics.

During the mid-afternoon, DPD conducted a gang unit operation at the Complex. They went there in "full force" to detain individuals for any offense they could observe, and to gather gang intelligence. It was necessary to enter the Complex in force, and with the element of surprise, due to the nature of the crimes committed on, and the people who frequented, the premises. The Complex was gated, and it was constructed with only one entrance and exit. The element of surprise was necessary for the officers to avoid an ambush and to prevent persons from observing the officers' impending presence and tipping off others. Several police officers, including Officer Reuler, Gregory Ceraso ("Officer Ceraso"), and Christopher Paul Nilsen ("Officer Nilsen"), entered the Complex in an unmarked Tahoe. Although the vehicle was unmarked, the occupants were all wearing DPD uniforms. Several marked police vehicles followed closely behind the Tahoe.

As the Tahoe arrived at the Complex, the officers were looking for signs of illegal activity. Based on information Gomez had given him earlier later day, Officer Reuler focused on the right-hand side (i.e., the northeast corner) of the Complex. He observed a

person (whom he later determined was Thompson) standing near a homeless person. The two appeared to be engaged in a hand-to-hand drug transaction. Officer Reuler reached this conclusion based on the close proximity of the two persons, their hand movements, and his training and experience, in general and with the Complex specifically. Officer Reuler was within about five yards (ten to fifteen feet) of Thompson when he observed this conduct. Officer Ceraso also observed this conduct and concluded that Thompson and another person were apparently engaged in a hand-to-hand drug transaction. It appeared to Officer Ceraso that Thompson was most likely the seller.

As the officers exited the Tahoe, two attempted to detain Thompson, but he backed up and then ran into apartment 118. Officer Ceraso called out to Thompson to stop. Because the Complex was a known drug location, the officers believed that Thompson had been involved in a hand-to-hand drug transaction and that he would possibly destroy evidence, so they engaged in hot pursuit. At the time, the officers had probable cause to believe Thompson was evading arrest and had committed a drug trafficking crime.

Officers Ceraso and Nilsen pursued Thompson, and Officer Ceraso instructed Officer Nilsen to go to the rear of apartment 118 to prevent an escape. While the officers stood guard outside the apartment, Officer Reuler went directly to the office of the Complex manager, Gomez, to get the key to the apartment. The office was located approximately three doors down from apartment 118. Gomez gave Officer Reuler the key almost instantaneously. Officer Reuler decided to obtain the key because, based on executing

numerous search warrants and making numerous arrests at the Complex, it was possible the door would be barricaded. There was also the potential that someone inside the apartment would shoot through the door. Gomez had mentioned apartment 118 on several occasions. He said he had seen a shotgun in the apartment, that he believed drugs were being sold from the apartment, and that the occupant of the apartment had previously used a firearm to threaten a person attempting to tow a vehicle at the Complex. For safety reasons, Officer Reuler did not want to kick in the door.

Officer Reuler used the key to open the door of apartment 118. Inside the apartment, the officers found Thompson lying on the floor of the small living room, in the surrender position on his stomach. Several officers conducted a protective sweep of the apartment, during which they observed a shotgun leaning against the wall, situated close to where Thompson lay. Thompson was arrested and searched. The officers found a package of marihuana in his pants pocket.

Thompson now moves to suppress all evidence, including the firearm and all observations obtained therefrom, derived through the April 13, 2011 warrantless search. The government responds that the warrantless search was permissible based on exigent circumstances, including (1) hot pursuit of a fleeing suspect, (2) the risk of danger to the police and others, and (3) to prevent Thompson from potentially destroying evidence of criminal activity.

II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *United States v. Powell*, 137 Fed. Appx. 701, 703-04 (5th Cir. 2005) (per curiam) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). "Warrantless entry into a home is presumptively unreasonable." *United States v. Maldonado*, 472 F.3d 388, 392 (5th Cir. 2006) (citing Payton v. New York, 443 U.S. 573, 587 (1980)). A warrantless entry and search of a person's home can be justified, however, if there is probable cause and exigent circumstances. *See id.*; *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). The government has the burden of establishing the existence of circumstances justifying warrantless entry. *Maldonado*, 472 F.3d at 393.

Probable cause exists if, under the totality of circumstances, there is a fair probability that contraband or evidence of a crime is inside or an illegal act is taking place. *United States v. Newman*, 472 F.3d 233, 236-37 (5th Cir. 2006). "There is no set formula for determining when exigent circumstances justify a warrantless entry." *Maldonado*, 472 F.3d at 393 (citing *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997)). Exigent circumstances include hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. *United States v. Fabian*,

220 Fed. Appx. 340, 342 (5th Cir. 2007) (per curiam) (citing *United States v. Richard*, 994 F.2d 244, 247-48 (5th Cir. 1993)).  To determine whether exigent circumstances justify a warrantless entry, the court must focus upon the reasonableness of the officer's actions in light of the circumstances of the scene as it would appear to a reasonable person standing in the shoes of the officer.  *See Blount*, 123 F.3d at 838; *United States v. Rodea*, 102 F.3d 1401, 1405 (5th Cir. 1996).  If reasonable minds could differ, the courts should not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation.  *Blount*, 123 F.3d at 838.

III

Based on the evidence presented during the hearing, the court finds and concludes that exigent circumstances justified the warrantless entry into Thompson's apartment.

Officers Reuler and Ceraso had probable cause to believe they had witnessed Thompson engage in a hand-to-hand drug transaction.  It appeared to Officer Ceraso, at least, that Thompson was most likely the seller.  *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (defining "probable cause" as facts and circumstances "'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" (quoting *Beck v. Ohio*, 379 U.S. 89 (1964)).  The Complex was a known location for high crime, gang activity, and illegal narcotics trafficking.  Officers Reuler and Ceraso witnessed Thompson standing in close proximity to another man and observed hand movements that appeared to be the exchange of items.  Based on their experience in general and with the

Complex specifically, Officers Reuler and Ceraso recognized this behavior as typical of a narcotics transaction. Further, when Officer Ceraso commanded Thompson to stop, Thompson fled into his apartment, giving the officers probable cause to believe he would destroy evidence of the criminal conduct they had just witnessed.

Selling illegal narcotics is a felony offense under Federal law.[2] *See* 21 U.S.C. § 841(a) & (b). When Officer Ceraso commanded Thompson to stop, and Thompson ran into his apartment and closed and locked the door, Officers Ceraso and Reuler had probable cause to believe that Thompson was a fleeing felon.

The Supreme Court and the Fifth Circuit recognize that the hot pursuit of a fleeing felon is an exigency justifying a warrantless search and arrest. *United States v. Santana*, 427 U.S. 38, 43 (1976) ("[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place."); *Payne v. City of Olive Branch*, 130 Fed. Appx. 656, 662 (5th Cir. 2005) (per curiam) ("'Hot pursuit' of a suspect is recognized as an exigency justifying a warrantless search.") (citing Santana, 427 U.S. at 41-43 & n.3).

In addition, the warrantless search was justified by the need to preserve evidence. "[T]he need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search." *Kentucky v. King*, __ U.S. __, 131 S. Ct.

---

[2]Although the distribution of "a small amount of marihuana for no remuneration" is treated as a misdemeanor, *see* 21 U.S.C. § 841(b)(4), the evidence establishes there was probable cause to believe this was a hand-to-hand drug transaction, not an exchange for no remuneration.

1849, 1856 (2011) (internal quotation marks omitted) (citing cases). As explained above, the officers had background knowledge that drugs were being sold out of apartments located at the Complex. They had just witnessed Thompson engage in what they believed to be a hand-to-hand drug transaction, and Thompson fled to his apartment and locked the doors after the officers unexpectedly arrived on the scene, observed the transaction as it was occurring, and commanded him to stop when he fled. Thompson was aware that the officers were pursuing him. If he had been selling drugs from his apartment and was still in possession of illegal narcotics, he could have destroyed any evidence of drugs during the time it would have taken the officers to obtain a warrant. *See, e.g., United States v. Aguirre*, 664 F.3d 606, 611-12 (5th Cir. 2011) (where there was probable cause that drugs would be found inside the residence, warrantless entry was "justified by the need to halt destruction of evidence."); *United States v. Riley*, 968 F.2d 422, 425 (5th Cir. 1992) ("The need to preserve evidence that may be lost or destroyed if a search is delayed is and has long been a consideration in determining the existence of exigent circumstance." (citing cases)). In fact, when he was arrested, officers found a package of marihuana in his pants pocket. Entry without a warrant was justified by these exigent circumstances.

Even if the court were to conclude that the officers lacked probable cause to believe that Thompson was a fleeing *felon* or to believe that they needed to prevent the imminent destruction of evidence, the court finds that reasonable minds could differ. At least one officer believed he had witnessed a hand-to-hand drug transaction in which Thompson was

the seller, i.e., that he had witnessed the commission of a felony. And officers at the scene believed that Thompson would destroy evidence of the crime he had just committed. Where, as here, "reasonable minds could differ, [courts] will not second-guess the judgment of experienced law enforcement officers concerning the risks of a particular situation." *United States v. Hearn*, 563 F.3d 95, 106 (5th Cir. 2009) (quoting *Blount*, 123 F.3d at 838) (internal quotation marks omitted).

IV

During closing argument at the evidentiary hearing, Thompson's counsel presented for the first time the contention that the seizure of the firearm was not permitted under the "plain view" doctrine. He asserted that the arresting officers did not know at the time of the seizure that the firearm was contraband because they were unaware that Thompson was a felon.

"The 'plain view' doctrine will justify a warrantless seizure if: (1) the officers lawfully entered the area where the items were located; (2) the items were in plain view; (3) the incriminating nature of the items was 'immediately apparent'; and (4) the officers had a lawful right of access to the items." *United States v. Buchanan*, 70 F.3d 818, 825-26 (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). "The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband." *Id.* (citing *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987)). "Probable cause does not require certainty." *Id.* (citing *Texas v. Brown*, 460

U.S. 730, 742 (1983)). "A probable cause determination should be based on the totality of the circumstances," and the "evidence in support of probable cause 'must be viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search." *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993) (citations omitted).

Because this argument was raised for the first time during closing argument, the government lacked an opportunity during the testimony phase of the hearing to develop evidence to address this contention directly. Nevertheless, considering the totality of circumstances and the other evidence developed during the hearing, the court finds and concludes that the government proved that the officers had probable cause to believe the shotgun was contraband. As the court has already explained, the police officers had probable cause to believe Thompson had just engaged in a hand-to-hand drug transaction, most likely as the seller. When the officers arrived on the scene, Thompson fled to his apartment, ignoring the police commands to stop. Thompson entered an apartment located in a complex that the officers knew (indeed, it was widely known) to be a location for drug trafficking. Upon entering Thompson's apartment, the officers observed the shotgun situated in close proximity to where Thompson was lying in a "surrender" position. The incriminating character of the shotgun was "immediately apparent" based on the surrounding circumstances and "because it is commonly known that drug dealers use firearms in the course of their illegal activities." *United States v. Hatheway*, 1993 WL 209903, at *2 (5th

Cir. 1993) (per curiam); *see also United States v. Armstrong*, 554 F.3d 1159, 1163 (8th Cir. 2009) (where officers had probable cause to believe defendant was engaging in drug trafficking and "[b]ecause it is unlawful to use, carry, or possess a firearm in furtherance of a drug trafficking crime," handgun's incriminating nature was immediately apparent and admissible. (citing 18 U.S.C. § 924(c)(1)(A))); *United States v. Matthews*, 942 F.2d 779, 783 (10th Cir. 1991) (holding that incriminating character of firearms was immediately apparent, because "it has become common knowledge that drug operators frequently acquire weapons for use in connection with drug activities."). Accordingly, the officers properly seized the shotgun under the "plain view" doctrine because they had probable cause to believe the firearm was evidence of illegal drug trafficking.[3]

\* \* \*

For the reasons explained, Thompson's December 27, 2011 motion to suppress is denied.

**SO ORDERED.**

April 9, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[3] To the extent Thompson argues that the shotgun was not in "plain view," the court rejects as not credible the testimony of the witnesses whom Thompson called and who so testified. The court finds to be credible Officer Reuler's testimony that the shotgun was leaning against the wall a few feet from where Thompson was lying on the floor.